UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

BLUEBONNET HOTEL VENTURES, LLC

CIVIL ACTION

VERSUS

10-489-JJB-SEALED

WACHOVIA BANK, N.A., ET AL.

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a motion for summary judgment filed by Defendant Wells Fargo[1] (Doc. 80). Plaintiff Bluebonnet Hotel Ventures, LLC ("Bluebonnet") has filed an opposition (Doc. 109), to which Wells Fargo has filed a reply. (Doc. 128). Oral argument is not necessary. For the reasons herein, the Court GRANTS the Defendant's Motion for Summary Judgment. (Doc. 80).

I. Factual Background

Bluebonnet was created in order to construct a new hotel in Baton Rouge, Louisiana. Bluebonnet sought to issue tax-exempt Gulf Opportunity Zone ("GO Zone") bonds in order to finance the hotel's construction. (Doc. 19). In order to attract investors, bond issuers typically seek a letter of credit to provide credit enhancement for the bonds, and Bluebonnet sought a letter of credit from Wells Fargo. In March 2007, a term sheet was executed and signed by a representative from the bank and Milford Wampold ("Wampold"), the real estate developer and managing member of Bluebonnet. The term sheet proposed the terms and requirements for a $42 million letter of credit and provided in part:

---

[1] Bluebonnet originally dealt with Wachovia Bank, but Wachovia Bank merged with Wells Fargo Bank. The parties use both Wachovia and Wells Fargo interchangeably. This Court has referred to the Defendant as Wells Fargo in prior rulings (Doc. 42), and will continue to do so here.

1

Swanson
Cheatwood

> *THIS LETTER IS NOT A COMMITMENT OR AGREEMENT TO LEND MONEY OR EXTEND CREDIT, AND SHALL NOT CONSTITUTE A "CREDIT AGREEMENT" UNDER THE TEXAS CREDIT AGREEMENTS ACT. This letter is intended solely as a summary of certain terms of a loan you have asked us to consider . . . [and] does not confer any rights or impose any obligations on you or us.*

(Doc. 82, Ex. E, at 4) (emphasis and capitalization in the original). The term sheet also provided that the bank had the right to cancel the letter and cease negotiations in the event of five possible scenarios, which did not occur here. The term sheet indicated that prior to a commitment for a line of credit, Bluebonnet was required to satisfy certain conditions, including:

> Wachovia's review and approval of a Guaranteed Maximum Price construction contract with bonding subject to underwriting of general contractor.
> ***
> GO Bond financing structure documentation, subject to Lender approval.

(Doc. 82, Ex. E, at 3). However, these conditions were not satisfied and the parties continued to negotiate the terms of a letter of credit.

As Wells Fargo continued evaluating Bluebonnet's application, complications with its proposed contractors forced Bluebonnet to repeatedly delay and change plans for the hotel, which modified essential details as previously laid out in the original term sheet. (Doc. 82, p. 5, n.13; Doc. 82, p. 11). Due to the change in the plans and information from Bluebonnet, Wells Fargo was not able to go through on the original term sheet. (Doc. 82, p. 5, 14). The GO Zone bonds were granted approval in September of 2007, and were issued in May of 2008. (Doc. 109, p. 12, 14). Two weeks before the issuance of the bonds in May of 2008, and 13 months after the execution of the original term sheet, Bluebonnet attempted to gain a provisional $2.5 million letter of credit from Wells Fargo in order to preserve its bond allocation. (Doc. 82, p. 14). Wells

2

Fargo informed Bluebonnet that it "could not issue a partial or dry closing" in the two weeks provided. (Doc. 128, p. 5, n. 12). Bluebonnet closed on alternative, limited financing from Regions Bank to preserve the bond allocation. (Doc. 82, p. 5 and Doc. 109, p. 15).

After the original term sheet was signed, on May 1, 2007, Wampold signed a swap contract on behalf of Bluebonnet at Wells Fargo's suggestion. The purpose of the swap contract was to hedge the floating interest rates on the anticipated bonds that Bluebonnet intended to issue by adjusting Bluebonnet's "put" payments to a fixed rate.[2] Should the interest rates rise above the fixed rate, Wells Fargo would pay the difference, and if the interest rates fell below the fixed rate, Bluebonnet would pay Wells Fargo the difference. (Doc. 42 at 2, n.2). The original swap contract had an estimated value of $40 million and a term of 30 years. (Doc. 82, p. 7). Before Wampold signed the contract, he was made aware that it required his personal guaranty because it would be executed independently of any other financing he might receive from Wells Fargo. (Doc. 82, p. 10). He was further made aware of this when he signed the official swap contract in May of 2007. (Doc. 82, p. 12-13). Wampold delayed the start date of the swap contract six times, making the effective date May 2, 2008, nearly a year later than the original August 1, 2008 start date. (Doc. 82, p. 8) During this time, the interest rates on the bonds dropped significantly, so that Wampold had to pay the difference in the rates. (Doc. 82, p. 8).

After securing the funding from Regions Bank to cover the bonds, Wampold returned to Wells Fargo to obtain permanent financing through a letter of credit for the hotel. (Doc. 82, p. 14). Wells Fargo was unable to grant a letter of credit under the original term contract due to Wampold's late changes to the hotel design in 2009, which differed from the original 2007 hotel

---

[2] As this Court has already explained, a swap contract "is a separate agreement whereby parties agree upon a fixed, baseline interest rate…and one party makes payment to the other based on whether the floating market interest rate…moves above or below the fixed interest rate." The interest rate swap is traditionally used by a party wishing to hedge against the risk of rising interest rates. (Doc. 42 at 2, n. 2) (citing *K3C Inc. v. Bank of America* 204 F.App'x. 455, 458-59 (5th Cir. 2006))

design. (Doc. 82, p. 5, n.13). Wampold ultimately financed the project from a loan from Regions Bank in October of 2011. (Doc. 82, p. 5).

Wampold subsequently brought this action to rescind the swap contract for failure of cause, negligence, and detrimental reliance. (Doc. 1). Wampold claims that the principal cause of the swap agreement was the anticipated letter of credit which never materialized. (Doc. 19). Wells Fargo filed a Motion to Dismiss (Doc. 24), and argued that the swap contract documents stated that the agreement was governed by New York law, Bluebonnet's rescission claim failed under Louisiana and New York law, and Bluebonnet failed to state a claim for negligence and detrimental reliance. This Court granted in part and denied in part Wells Fargo's motion. The Court found that Bluebonnet stated a plausible claim for rescission because Bluebonnet had a firm and reasonable belief that the cause of the swap contract, the letter of credit, would be forthcoming. (Doc. 42, p. 13). The Court also found that Bluebonnet had a valid claim for detrimental reliance at that stage of the litigation because Bluebonnet's claim pointed to intensive factual determinations yet to be made at the time. (Doc. 42, p. 20). The Court found Bluebonnet failed to state a claim for negligence because Wells Fargo and Bluebonnet maintained an ordinary bank-client relationship and Wells Fargo undertook no additional duty with regard to Bluebonnet. (Doc. 42, p. 19). The Court also dismissed the declaratory judgment claim as premature. (Doc. 42, p. 22).

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The movant, or party seeking summary judgment, bears the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

III. Discussion

Wells Fargo now brings forth this Motion for Summary Judgment (Doc. 82) that the swap contract is valid. Wells Fargo argues that Wampold's actions after receiving the Regions loan show that the swap contract was not predicated on the March 14, 2007 term sheet. (Doc. 82, p. 9-16). Wells Fargo further claims that Bluebonnet's alleged error (that the cause for entering into the swap contract was Wampold's belief that the bank would issue a letter of credit based upon the term sheet), does not support a failure of cause. (Doc. 82, p. 17). Wells Fargo further claims that Bluebonnet has not asserted a detrimental reliance claim as a matter of law because there was no promise of a letter of credit and any reliance on a promise made outside the fully integrated swap contract is unreasonable as a matter of law. (Doc. 82, p. 30, 33).

Bluebonnet opposes, stating that Wells Fargo has not met the Summary Judgment standard. (Doc. 109, p. 19). Bluebonnet claims that the cause of the swap contract was to fix the rate on the hotel financing, and that the swap contract was part of the overall transaction between the parties. (Doc. 109, p. 23). Bluebonnet argues that Louisiana law permits rescission of a contract for changed circumstances when the circumstances are within the control of the party seeking to enforce the contract, seen here with Wells Fargo. (Doc. 109, p. 29). Bluebonnet further claims that it intends to prove reasonable reliance on Wells Fargo's promises to grant a letter of credit and that this entitles Bluebonnet to relief from harm suffered by detrimental reliance. (Doc. 109, p. 32). Bluebonnet buttresses its argument for the legitimacy of its contractual cause and the reasonableness of its reliance upon the contention that Bluebonnet's accomplished leadership did not review "boilerplate language buried in small font," which disclaimed the unsettled status of their credit line negotiations and the independence of the swap contract. (Doc. 109, p. 24).

Case 3:10-cv-00489-JJB-RLB   Document 149   07/08/13   Page 5 of 11

A. <u>Rescission Claim</u>

Louisiana law contemplates the possibility that changed circumstances may constitute a failure of cause when the "cause" is within the control of the party seeking to enforce the contract. Rescission may be obtained when error vitiates consent. La. Civ. Code art. 1949. Nevertheless, the Court finds that the record contradicts Bluebonnet's claim that its determined or determinable cause for the swap contract was to fix the rate on its anticipated bond issuance, contingent upon Wells Fargo's extending a line of credit. La. Civ. Code. art. 1971. This financial instrument was intended to, in speculative – and ultimately incorrect – anticipation of rising interest rates, provide Bluebonnet with a stable and potentially cost-effective method of making payments to any bond holders wishing to exercise their "put" rights on bonds that it desired to release (Doc 109, p. 4). Bluebonnet's consent to enter into the swap contract was not vitiated by error as to its cause because its letter of credit negotiations did not constitute a circumstance which both parties, in good faith, should have regarded as a cause of the swap obligation. La. Civ. Code art. 1950. The Court finds that neither party could have reasonably determined that a letter of credit was the certain conclusion to their negotiations. Therefore, such a determination cannot constitute a cause whose failure would vitiate consent. La. Civ. Code art. 1949, 1950.

Wells Fargo did not refuse to issue a letter of credit reflecting previously settled terms upon which Bluebonnet could have reasonably relied in deciding to enter into the swap contract. The parties executed the original term sheet on March 14, 2007, which contained language that declares that the term sheet is not a commitment (in all caps), as well as additional language providing five circumstances under which Wells Fargo could automatically cancel the term sheet and negotiations. (Wells Fargo's Memorandum in Support of Motion for Summary Judgment

that the Swap Contract is Valid, [R. Doc. No. 82], at Ex. "E").  The contradictory nature of these cancellation provisions, however, is immaterial and does not give rise to this dispute.  Rather than the enforceability of the March 14, 2007 term sheet, it is instead Bluebonnet's claim of reliance upon the inevitability of a line of credit, based upon its understanding of the character of the parties' negotiations, which is contested.  (Doc. 82, p. 9).

Bluebonnet contends that it relied upon the promissory nature of this term sheet when deciding to execute the swap contract, yet neither party requested a closing upon these original terms or sought to otherwise enforce them. (Doc. 128, p. 5).  Instead, the parties' subsequent communications and actions reflect the unresolved nature of the credit negotiations.  First, the initial term sheet's cancellation provisions indicate this quality of their discussions. (Wells Fargo's Memorandum in Support of Motion for Summary Judgment that the Swap Contract is Valid, [R. Doc. No. 82], at Ex. "E").  Next, Wampold indicated in his deposition that he also understood their negotiations, including the term sheet, to not constitute set and binding agreements which would bar him from modifying his hotel plans, and consequentially the terms of a credit agreement.  (Doc. 128, p. 10, n. 31).  The parties renegotiated the credit terms in light of the changes Bluebonnet made to the hotel plan, and this same unsettled nature which was present when the swap contract was executed persisted even into 2009, when Bluebonnet sought a new term sheet that did not include the 2007 terms.  (Doc. 128, Ex. "C").  The record reflects that no certainty had yet come to the parties' negotiations around these credit terms by the time that Bluebonnet executed the swap contract, nor that Bluebonnet could have reasonably anticipated otherwise.[3]

---

[3] Wells Fargo states that Bluebonnet's posited cause does not support a failure of cause claim because it was a risk taken about an uncertain future event.  Wells Fargo relies on *In re Merrill Lynch Auction Rate Securities Litigation*, 2010 WL 1924719, 6\* (S.D.N.Y. May 11, 2010); and *St. Charles Ventures, L.L.C. v. Albertsons, Inc*. 265 F.Supp. 2d 682, 694 (E.D. La. 2003).  The Court agrees that the future execution of a credit line from Wells Fargo was

7

Additionally, Wampold's belief that a Wells Fargo letter of credit was forthcoming should have been seriously challenged by his communications with Wells Fargo representatives and the four corners of the swap contract itself and each of its six extensions executed by Bluebonnet. (Doc. 128, p. 1, n. 2). The Court recognizes that the provisions contained within the swap contract cannot have controlling weight so long as the validity of Bluebonnet's consent is in question, but that they undoubtedly join with other communications between the parties to weigh upon the validity of Bluebonnet's claim. Although both parties envisioned executing a letter of credit, (Doc. 128, p. 7-8), the uncertain status of that agreement was repeatedly clarified in the parties' swap contract communications.[4] Wells Fargo describes the topic of the email containing its disclaimers as "fixing the rate on your planned floating rate issuance." (Doc. 109, Ex. "L"), but the Court does not find that Wells Fargo's use of the word "planned" for Bluebonnet's bonds indicates that the most reasonable interpretation of these communications was that a letter of credit was forthcoming. Contrary to Bluebonnet's contention, the Court finds that Wells Fargo effectively proclaimed the separate nature of the swap contract from the on-going credit negotiations, and did not contradict that message by referring to Bluebonnet's intentions as "planned."

Further, the Court is not compelled by the unsubstantiated argument that Wampold failed to review a significant financial agreement before collateralizing his hotel for it, and, inserting Bluebonnet's argument, that there exists some procedural unconscionability which nullifies merely the portions of its communications with Wells Fargo that contain disclaimers of the swap

---

uncertain. Further, the record does not reflect the assured finality of a credit agreement requisite to Bluebonnet's argument. The above cases give uncertain events, however, which are so factually distinct that they cannot be controlling and the Court will not address them directly.

[4] Doc. 128, Ex: "Y" 5/1/07 email from Jason Smith to Sike Wampold "As discussed, we will tie the swap to the letter of credit so that the hedge would need to be transferred or settled should Wachovia not provide the letter of credit (otherwise it remains as-is); Doc. 82, Ex. "W," "Interest Rate Risk Management" Presentation, dated March 2007, ("separate and independent…and would not be contingent on whether or not any loan or other financing closes").

8

agreement's independent nature. (Doc. 82, p. 24, 28). The disclaimer within the swap contract itself cannot be dispositive without first finding for the validity of the contract. Collectively, however, it works with Wells Fargo's other notices of the swap contract's independence to show that Wampold, an experienced businessman, was not unfairly surprised or lacked meaningful choice. See Melissa T. Lonegrass, *Finding Room for Fairness in Formalism-the Sliding Scale Approach to Unconscionability*, 44 LOY. U. CHI. L.J. 1, 9 (2012) ("…courts look for evidence of "oppression" and 'unfair surprise' indicating that the transaction lacked meaningful choice on the part of the complaining party"); also, e.g., *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 204 (5th Cir. 1987). Therefore, Bluebonnet's contention constitutes Wampold's own inexcusable neglect, not the presence of procedural unconscionability.

In light of their continued negotiations, the prevailing volatility of requisite terms, and Wells Fargo's efforts to distinguish the swap contract as an independent instrument designed for a planned bond issuance that it would not necessarily act as credit provider for, Bluebonnet could not have reasonably determined that a letter of credit was forthcoming and that it would not be forced to seek funding elsewhere in order to complete its bond issuance. Summarily, the swap contract cannot be invalidated for unilateral error when Wells Fargo could not have known that Bluebonnet's principal cause was an unreasonable presumption that an unsettled letter of credit was inevitable. *Degravelles v. Hampton*, 652 So.2d 647 (1st Cir. 1995).

B. <u>Detrimental Reliance Claim</u>

Similarly, the Court finds that the letter of intent and surrounding representations by Wells Fargo regarding the letter of credit did not rise to the level of a promise so that Bluebonnet's reliance upon that information was reasonable. Much as Bluebonnet's reliance upon its understanding of the parties' negotiations was unreasonable and an insufficient error of

9

principal cause to invalidate the contract, so too the Court finds that Wells Fargo's representations were not promises upon which Bluebonnet could have reasonably relied.

Article 1967 lays out the three elements of a detrimental reliance claim: 1) a representation by conduct or word; 2) justifiable reliance on the representations; and 3) detrimental change in position because of the reliance. *Babkow v. Morris Bart, P.L.C.*, 726 So.2d 423, 427 (La. App. 4th Cir.1998); La. Civ. Code art. 1967. Detrimental reliance "functions when no written contract or an unenforceable contract exists between the parties." *Drs. Bethea, Moustoukas, and Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 403 (5th Cir. 2004). The existence of reliance is generally a factual determination. *Id*. at 403-04. However, an unambiguous contract may be interpreted as a matter of law. *Id*.

As discussed above, the swap contract is not vitiated by Bluebonnet's unilateral error. Executing the swap contract was not a detriment suffered by Bluebonnet because of reasonable reliance upon promises made. It is not reasonable for a party to rely upon representations made outside the scope of a fully-integrated, written agreement. *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1329-30 (5th Cir. 1994). In *Omnitech*, the focus of the court's inquiry was upon the reasonableness of Omnitech's professed reliance upon the defendant's "repeated assurances" of business beyond that described in their fully-integrated contract. *Id*. The Fifth Circuit held that the trial court did not err in finding Omnitech's reliance unreasonable as a matter of law. *Id*. at 30. Similarly, the law between the parties at present is provided by the valid and unambiguous swap contract, including an unambiguous disclaimer which reiterates Wells Fargo's contention that all credit negotiations between the parties operate independently. Therefore, costs arising from the swap agreement are not damages for which Bluebonnet may seek relief under detrimental reliance.

Case 3:10-cv-00489-JJB-RLB   Document 149   07/08/13   Page 10 of 11

"The purpose of this remedy is to afford a party relief whenever no contract is found." *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F.Supp. 2d 518, 557 (M.D. La. 2004). However, where Wells Fargo did not and could not have known that Bluebonnet construed their credit negotiations as a settled agreement, Bluebonnet was not reasonable in so relying. *Contra* La. Civ. Code art. 1967. As discussed above, the original letter of intent was an unenforceable agreement that the parties soon abandoned; Bluebonnet repeatedly changed the hotel plans, Wells Fargo required reassessments of critical terms (Doc. 82, Ex. E, at 3), and negotiations continued for over two years. The actions of both parties evidenced the unresolved nature of their negotiations and the absence of any "representation…made in such a manner that the promisor should have expected the promissee to rely upon it." *Suire v. Lafayette City-Parish Consol. Gov't*, 2004-1459, p. 31 (La. 4/12/05); 907 So. 2d 37, 59.

IV. Conclusion; Order

Accordingly, Wells Fargo's motion for summary judgment (Doc. 80) is hereby GRANTED. Signed in Baton Rouge, Louisiana on July 8, 2013.

_____
**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**